**FARMERS AND MERCHANTS INSURANCE COMPANY,**
Appellant,

v.

**Rita K. COLOGNA and Paulette Cologna, Respondents.**

No. 14890.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 18, 1987.

Motion for Rehearing or Transfer
to Supreme Court Denied
Sept. 8, 1987.

Application to Transfer Denied
Oct. 13, 1987.

Stephen H. Snead, Mann, Walter, Burkart, Weathers & Walter, Springfield, for appellant.

C. Ronald Baird, John R. Lightner, Dorr and Baird, P.C., Springfield, for respondent Paulette Cologna.

No appearance for respondent Rita K. Cologna.

CROW, Chief Judge.

Farmers and Merchants Insurance Company ("Farmers") appeals from a judgment, per jury verdict, declaring that policy number 7 68 89 87 ("the policy"), issued by Farmers to Rita K. Cologna ("Rita"), provides coverage for Rita's actions in causing the death of Eugene F. Cologna, Jr., ("Gene").

Rita, born April 14, 1946, married Gene in 1965, and they became parents of Tim, born February 15, 1968, and Elizabeth, born April 26, 1972. Rita and Gene were "divorced" in 1979, the decree awarding Rita "the family home and the acreage." The decree also provided, according to Rita, that she was "to remain the beneficiary on two life insurance policies on Gene's life."

At some undisclosed time thereafter, Gene married Paulette Cologna ("Paulette").

Effective August 4, 1982, Farmers issued the policy to Rita, covering the period from that date until August 4, 1983. The policy provided, among other things, that if suit were brought against Rita for damages because of bodily injury, Farmers would (a) pay up to its limit of liability for the damages for which Rita was legally liable, and (b) provide Rita a defense at Farmers' expense by counsel of Farmers' choice. There was, however, an exclusion stating that coverage did not apply to bodily injury "which is expected or intended by the insured."

On Saturday, March 26, 1983, Gene went to Rita's residence, and while he was there a shotgun, held by Rita, discharged, killing him. Rita's testimony about the incident is summarized *infra*.

Paulette thereafter commenced a wrongful death action against Rita, seeking money damages for Gene's death. While Paulette's action was pending, Farmers instituted the instant case, averring, among other things, that Rita either expected or intended that her actions would cause Gene's death, consequently the policy af-

forded Rita no coverage. Farmers prayed the court to enter a declaratory judgment construing the policy and determining the respective rights and liabilities of the parties.

Trial on July 1, 1986, produced the judgment described in the initial paragraph of this opinion.

The first of Farmers' five assignments of error that we consider is point IV, which maintains that the trial court erred in denying Farmers' motion for a directed verdict at the close of Farmers' evidence, in that Farmers' evidence, even when viewed in the light most favorable to respondents, established as a matter of law that Rita *intended* to cause bodily injury to Gene.

In a suit by an insurer seeking a declaratory judgment that a liability policy issued by it provides no coverage to an insured by reason of an exclusion in the policy, the burden is on the insurer to prove facts which make the exclusion applicable. *Mission Insurance Company v. Ward*, 487 S.W.2d 449, 451[3] (Mo. banc 1972). Consistent with that precept, Farmers tendered a verdict-directing instruction, given by the trial court, stating: "Your verdict must be for [Farmers] if you believe that [Rita] expected to cause bodily injury to [Gene]."

Only in exceptional circumstances, as in the case where a defendant in his pleadings or by his counsel in open court admits or by his own evidence establishes the plaintiff's claim, or where there is no real dispute of the basic facts supported by uncontradicted testimony essential to a plaintiff's claim, is a trial court justified in directing a verdict in favor of a plaintiff having the burden of proof. *Zagarri v. Nichols*, 429 S.W.2d 758, 760[2] (Mo.1968).

Mindful of those principles, we examine Farmers' evidence pertinent to the exclusion.

The only witness called by Farmers was Rita. She testified that about ten days before the shooting, she received a phone call from Gene at the residence she occupied with Tim and Elizabeth. Rita quoted Gene as saying he needed the insurance policies mentioned in the second paragraph of this opinion "for his taxes." At some

unspecified time thereafter, Gene, according to Rita, told her that he wanted to change the beneficiary on the policies from her and the two children to Paulette. Rita knew Gene "didn't have the right to do that."

On the Monday or Tuesday preceding the shooting, Gene came to Rita's residence, blocked her driveway, climbed the fence surrounding her house, and pounded on the door. When Rita went to the door, Gene said, "I need those insurance policies."

Rita instructed Tim and Elizabeth, who were departing for school, to leave via the back door, as she expected Gene would come in if they went out the front.

Gene, said Rita, threatened to block the driveway until she turned over the policies. Rita, who was "late for work," told Gene the policies were in the "safety deposit box." Gene thereafter departed.

On Wednesday afternoon, March 23, three days before the shooting, Gene phoned Rita, telling her he would be out to her house and she would sign the papers he wanted her to sign. Rita, who was taking "night classes" at a Springfield college, left immediately and went to a friend's home, where she remained until class time.

On Friday evening, March 25, Gene returned to Rita's home. Elizabeth answered the door, and told Rita Gene was there. Rita went to the door and was told by Gene that he had papers for her to sign. Rita said no.

Then, according to Rita, Gene "pushed his way on in and shoved me up against the wall in the house." Rita, at that time, was on medication she described as a "blood thinner" and "anticoagulant." As a result of Gene's incursion, Rita sustained "bruising," and a torn fingernail that bled.

An argument ensued, during which Gene said he was not leaving until Rita "signed the papers." Rita persisted in her refusal, and Gene eventually left.

About eight o'clock the next morning, there was a "pounding" on Rita's front door. Rita, Tim, Elizabeth, and one Marion Crum—described by Rita as her "boy

friend"—were in the house asleep. Rita arose, looked through a window, and saw Gene at the door.

Rita took Tim's shotgun from beneath Elizabeth's bed, obtained a shell from the utility room, and "pushed it in the thing at the bottom." She then went to the door, but did not take the gun with her, as she was "shaking out of fear."

When Rita opened the door, Gene was "out near the driveway." Gene, according to Rita, said he was "going to get some parts for the truck and would be back." With that, Gene departed.

Asked what her intent was when she got the gun, Rita replied, "I wanted him to understand that he couldn't come there every two or three days knocking on the door and disturbing our lives." Then, this:

"Q. Did you intend to shoot him?

A. No.

Q. Did you get the gun with the intent to do bodily injury to him?

A. No.

Q. Your intent was to scare him and say, 'Quit coming around about this insurance?'

A. Yes.

Q. You put the gun back in the kitchen that time because you were too nervous to use it, to use the gun?

A. Yes.

Q. You've had no real experience with guns, have you?

A. Very little."

After Gene left, Rita took the gun to the utility room. She then fed Tim and Elizabeth breakfast, took them to their "Saturday activities," ran some personal errands, and returned home "around eleven o'clock." Marion Crum was still there, asleep. A few minutes later, Gene knocked at the door. When Rita opened it, Gene demanded that she "sign the change of beneficiary forms."

Rita refused, telling Gene she was not obligated to do so. Thereupon, according to Rita, Gene said, "You are going to sign these or I will beat the shit out of you." At that point, Gene forced his way into the house. Rita became fearful about her

physical safety. She explained, "I bruise very easily, and if I was cut, the blood did not clot like blood would normally clot and any injury would be dangerous."

Rita went to the utility room, picked up the gun, entered the kitchen, and pointed the gun at Gene. Asked whether the safety was on or off, Rita replied she thought it was on, but she did not know.

Rita commanded Gene to get out of her house and off her property, pointing the gun in his "general direction." Gene backed from the kitchen into the dining room, followed by Rita. Gene stopped there, and Rita stopped in the "threshold area." Describing what occurred next, Rita testified:

"Q. And then he made a sudden movement toward you, didn't he?

A. Yes, he did.

Q. Did you think he was trying to get the gun from you?

A. Yes, I did.

Q. And you started to back up as he started to move toward you?

A. Yes, I did.

Q. And about halfway through your first step, the gun went off?

A. I don't—I couldn't tell you what step it was but the gun did go off when I backed up.

Q. You don't know whether you had your finger on the trigger or not?

A. I don't remember having my finger on the trigger. I don't know, know whether I did or not.

. . . .

Q. And at that point in time you knew, didn't you, that if a loaded gun was pointed in somebody's direction and that gun discharges for whatever reason that there is a great likelihood that that person at whom the gun was pointed will be injured or killed? You knew that, didn't you?

A. Yes.

Q. You don't know whether Gene Cologna ever touched the gun before or after it discharged, is that correct?

A. That is correct.

Q. When you stepped back in response to his movements, you don't know whether you tripped?

A. I think I stumbled.

. . . .

Q. Do you know of anything that came into contact with the trigger of this shotgun that caused it to go off other than your finger?

A. Not for—no.

. . . .

Q. ... you are not even sure that your finger caused it to discharge, are you?

A. No. I don't recall ever having my finger on the trigger at all.

Q. Now, you don't recall how many steps you took back from the time that you sort of came around the corner and he sort of came forward, but you took one or two steps back, didn't you?

A. Yes.

Q. And in the process of stepping back, you stumbled or tripped?

A. Yes.

Q. And when the gun went off, you all were practically right together, weren't you?

A. Yes.

. . . .

Q. But you don't know if he got ahold of the gun or not?

A. No, I don't."

Rita testified she was "in a state of shock" after the gun fired. It was admitted in the pleadings that a "projectile" from the gun entered Gene's body. Rita administered cardiopulmonary resuscitation to Gene, while Marion Crum, who had come out of the bedroom after the shot, phoned the "authorities."

Gene died as a result of the wound.

As noted earlier, Farmers insists that its evidence established as a matter of law that Rita *intended* to cause bodily injury to Gene, hence the trial court should have directed a verdict for Farmers at the close of Farmers' evidence.

■ Paulette[1] responds that Farmers' contention has not been preserved for review, inasmuch as the verdict-directing instruction given by the trial court at Farmers' request (quoted *supra*) did not submit that Rita *intended* to cause Gene bodily injury, but instead submitted that she *expected* to cause him bodily injury. Paulette points out that a party is bound on appeal by the theory upon which his instructions were predicated in the trial court, *Marusic v. Union Electric Co.*, 377 S.W.2d 454, 458–59[5] (Mo.1964), and that he will be held to have abandoned any theory on which he requested no instruction, *Whited v. Guarantee Trust Life Ins. Co.*, 237 S.W.2d 915, 916–17 (Mo.App.1951).

■ It will be recalled that the policy exclusion on which Farmers relies bars coverage for bodily injury[2] "expected or intended by the insured". Farmers, in its reply brief, says that "intended" and "expected" are "similar in meaning in the policy exclusion in the case at bar." Farmers adds, "We submit that acts which are presumed to be intended to cause bodily injury as a matter of law can and should be acts which are equally, if not more so, presumed to be expected to cause bodily injury as a matter of law." Farmers cites no authority supporting those proclamations.

In equating "intended" with "expected", Farmers takes a different position on appeal than it did in the trial court.

During the instructions conference, Rule 70.02(a), Missouri Rules of Civil Procedure (17th ed. 1986), Paulette's attorney moved orally for a directed verdict "regarding the issue of intent to do bodily harm, injury." In the colloquy that followed, one of Farmers' attorneys said, "That was abandoned or—." Consistent with that remark, Farmers, as we have seen, tendered a verdict-directing instruction submitting only that Rita *expected* to cause Gene bodily injury; the instruction did not hypothesize that Rita *intended* to cause Gene bodily injury.

---

**1.** Of the two respondents in this appeal, only Paulette filed a brief.

**2.** The "Definitions" section of the policy includes this: " 'bodily injury' means bodily harm ... and death resulting therefrom."

Additionally, Paulette requested an instruction stating, in pertinent part:

"The [issue] of Rita Cologna's intent to do bodily injury to [Gene] ... [is] withdrawn from the case and you are not to consider such evidence in arriving at your verdict."

The trial court gave such instruction, and Farmers, on this appeal, assigns no error about that.

The judgment recites, among other things, that after the close of all the evidence, "[Farmers] announces that it is abandoning its ... intent to do bodily injury issues." That recital is unchallenged in Farmers' brief.

By submitting in its verdict-directing instruction only that Rita expected to cause Gene bodily injury, after alleging in its petition that she either expected or intended that her actions would cause Gene's death, Farmers appears to have become concerned at trial that the jury would perceive a difference between "intended" and "expected," and to have opted for tactical reasons to attempt to convince the jury only that Rita expected to cause Gene injury. It is also noteworthy that Farmers tendered no instruction defining "expected". Paulette did tender an instruction defining that term, and the trial court gave it. In its brief, Farmers assigns no error in that regard. Farmers, of course, tendered no instruction defining "intended", as that term did not appear in Farmers' verdict-directing instruction.

In our opinion, the record conclusively establishes that Farmers elected not to have the jury decide whether Rita intended to cause bodily injury to Gene. We therefore hold, on the basis of *Marusic* and *Whited,* that Farmers has abandoned its contention that its evidence established as a matter of law that Rita *intended* to cause Gene bodily injury.

■ However, even had the issue been preserved, it would be unavailing because, as we shall see, Farmers' theory that it was entitled to a directed verdict in its favor at the conclusion of its evidence is without merit.

The first case cited by Farmers in support of that position is *Travelers Ins. Co. v. Cole,* 631 S.W.2d 661 (Mo.App.1982). There, a police officer named Didden entered the residence of one Cole, at the request of the latter's wife. While there, Didden was wounded by a shot from a gun held by Cole. Didden and his wife sued Cole. Cole's insurer brought a declaratory judgment action, claiming it was not obligated to defend or indemnify Cole under a "homeowner's policy" which afforded coverage for an accident which resulted in bodily injury "neither expected nor intended from the standpoint of the insured." Cole and the Diddens stipulated that Cole allowed the gun to be pointed at Didden at a time when Cole knew or should have known that the gun was loaded with an explosive charge and projectiles and would, if fired, cause serious injury, if not death, and that the gun discharged and injured Didden. The trial court ruled for the insurer, finding that Didden's injury was not accidental.

On appeal, it was held:

"Injury or damage is intentional if the insured acts with the specific intent to cause harm or if the insured's intent to harm is inferred as a matter of law from the nature or character of the act.... Intent to harm is inferred if the natural and probable consequences of an act are to produce harm." *Id.* at 664.

The opinion stated that Cole's action in discharging the gun at Didden was a dangerous act from which harm was almost certain to result, and that the trial court could properly infer Cole's intention to harm from those facts. The opinion went on to say that the intent and expectation of harm could also be inferred from the stipulation that Cole allowed the gun to be pointed at Didden when Cole knew, or should have, that it was loaded and, if fired, would cause serious injury, if not death. Judgment for the insurer was affirmed.

Farmers argues that the facts in the instant case are indistinguishable from *Travelers.*

We disagree. Unlike the instant case, there was no indication in *Travelers* that the gun went off unexpectedly at a time when Cole was stumbling or moving backwards. On the contrary, the opinion flatly states: "Cole shot Officer Didden...." *Id.* at 663. *Travelers* does not compel us to hold that Farmers' evidence established as a matter of law that Rita intended to cause Gene bodily injury.

The other two shooting cases relied on by Farmers are likewise factually distinguishable.

In *Shelter Mutual Insurance Co. v. Parrish*, 659 S.W.2d 315 (Mo.App.1983), the insured testified he pulled the trigger intentionally. The opinion said, "It is beyond dispute that [the insured] intentionally pulled the trigger of the pistol while it was aimed directly at [the victim]...." *Id.* at 319.

In *Blue Ridge Insurance Co. v. Nicholas*, 425 F.Supp. 827 (E.D.Mo.1977), Nicholas and Snarr had an altercation with Burton and Theerman, at the conclusion of which Nicholas told Theerman he would be back with a gun. Nicholas and Snarr then departed, obtained a shotgun and a rifle at Snarr's residence, and started back to the site of the fracas. En route, Nicholas put a shell in the shotgun's chamber. Upon arrival, Nicholas pointed the shotgun directly at Theerman's chest, a foot away, and said he was going to shoot him. Theerman grabbed the barrel and a scuffle ensued, during which the shotgun discharged into Theerman's hand. Nicholas and Snarr immediately fled.

In the instant case, it was Gene who embarked on a course of conduct confronting and bedeviling Rita. Rita testified she initially got out the gun only for the purpose of persuading Gene to stop annoying her at her home. She did not carry the gun with her to the door the first time Gene came there on the fateful morning, nor did she arm herself with it the second time Gene appeared. Only after he forced his way in and threatened to beat her did she go to the utility room and pick up the gun.

At that point, Rita made no effort to harm Gene; she merely ordered him off her property, and followed him as he began backing away. Even when he made a sudden move toward her, she did not, according to her testimony, pull the trigger. Instead, so she said, she attempted to back up, stumbled, and the gun went off. Whether Gene grabbed the gun, causing it to discharge, is consigned to speculation.

The fact that Rita put a shell in the gun when she first obtained it does not, in our view, establish as a matter of law that the shooting, some three hours later, was intentional. The jury could reasonably find, and inferably did, that Rita loaded the gun so that she could, if necessary, use it in self-defense, but that its discharge was unintentional and unexpected.

Farmers' contention that its evidence established as a matter of law that Rita intended to cause Gene bodily injury is without merit.

■ The next point we address is point V, wherein Farmers maintains that the trial court erred in denying Farmers' motion for a directed verdict at the close of *all* the evidence, in that all of the evidence, viewed in the light most favorable to respondents, established as a matter of law that Rita *intended* to cause bodily injury to Gene.

For the reasons set forth in our discussion of point IV, we hold that Farmers has abandoned the issue it seeks to raise in point V. Moreover, even if the issue were preserved, it would be meritless.

Paulette presented three witnesses, all of whom were attorneys. They were called by Paulette because Farmers had pleaded, as a separate ground for denying coverage, that Rita had failed to cooperate with Farmers in the defense against Paulette's suit, and had "colluded and conspired" with Paulette in certain alleged respects.

Farmers, during its direct examination of Rita in its case-in-chief, questioned her pertinent to those allegations. Farmers concedes, in its brief, that Paulette's witnesses testified only on the issues of collusion and failure to cooperate, and that none of them gave any testimony on the issue of whether Rita intended to cause Gene bodily injury.

Rita presented no evidence.

It is thus obvious that Farmers' evidence on the issue of whether Rita intended to cause bodily injury to Gene was *all* of the evidence on that issue. Consequently, what we have said in rejecting Farmers' point IV applies with equal force to point V.

■ We turn now to point III, which avers that the trial court erred in permitting Paulette to call Rita's lawyer, Kerry Montgomery, as one of Paulette's witnesses. Farmers asserts that "attorneys of record for a party are precluded by ethical rules from testifying except in very limited circumstances." Farmers bases its argument on Rule 3.7,[3] one of the Rules of Professional Conduct found in Rule 4 of the Rules Governing the Missouri Bar and the Judiciary.

As explained in our discussion of point V, Paulette called three lawyers to testify in response to Farmers' contention that Rita had colluded and conspired with Paulette. Montgomery was one of them. He recounted that he represented Rita in the execution of an agreement with Paulette pursuant to § 537.065, RSMo 1978, and that he told Rita the agreement "was in her best interests," as it provided that no judgment against Rita in Paulette's wrongful death suit could be collected from Rita's personal assets.

Montgomery, on Rita's behalf, had filed an answer to Farmers' petition in the instant case, but he did not appear as Rita's counsel at trial.[4]

At the conclusion of the evidence, Farmers informed the trial court that Farmers had abandoned its theory that Rita had failed to cooperate in the defense of Paulette's suit and had colluded and conspired with Paulette. The withdrawal instruction mentioned in our discussion of point IV told the jury that the issues of Rita's "collusion and conspiracy with [Paulette], and [Rita's]

failure to cooperate with [Farmers]" were withdrawn from the case.

The foregoing circumstances demonstrate that point III affords Farmers no basis for reversal.

First, Montgomery did not act as an advocate at the trial; his only role was as a witness, called by *Paulette*, not by his own client. That Montgomery advocated nothing is amply demonstrated by these excerpts from his testimony:

"Q. And as a result [of the § 537.065 agreement], isn't it true that neither you nor Rita Cologna have any preferences as to who wins this lawsuit?

A. We could care less.

. . . .

Q. ... And Rita Cologna has no interest in this case?

A. None whatsoever as far as I know."

Farmers cites no authority holding that Rule 3.7 applies in a situation like the one here, and the Comment beneath the rule illustrates it does not. The Comment says: "Combining the roles of advocate and witness can prejudice the opposing party and can involve a conflict of interest between the lawyer and client." It is manifest that Montgomery did not combine the roles of advocate and witness in the trial below.

■ However, we need not base our denial of point III on that ground alone. Farmers concedes in its brief that Montgomery's testimony pertained only to "the issues of fraud and collusion, which issues were not submitted to the jury." Therefore, even if the admission of Montgomery's testimony had been error, the error would have been harmless, as such testimony pertained only to issues abandoned by Farmers, and was consequently immaterial and could not have prejudiced Farmers. *Jenkins v. Wabash Ry. Co.*, 335 Mo. 748,

---

3. Rule 3.7, p. 86, Missouri Rules of Court (17th ed. 1986), provides, in pertinent part:

"(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client."

4. Rita appeared in person at trial, but was unrepresented.

73 S.W.2d 1002, 1006–07[6] (1934); *Weinel v. Hesse,* 174 S.W.2d 903, 906[3] (Mo.App. 1943). Point III is without merit.

Farmers' point II, which we next consider, charges the trial court with error in granting a request by Paulette in a motion in limine that Farmers' counsel be forbidden from mentioning during voir dire, opening statement, trial and closing argument that a self-defense jury instruction had been given in "the Rita Cologna criminal case." Paulette's motion averred:

> "In the capital murder case, not only was a self defense instruction submitted to the jury, but an instruction was also submitted upon which the jury could find the shooting to have been an accident. Obviously, the defendant in the criminal case tendered inconsistent theories in jury instructions, and they should not be admitted for the same reason that inconsistent pleadings should not be admitted."

The first problem with point II is that the factual basis for it is not supplied by the record. Farmers made no offer to prove that the State charged Rita with capital murder, that she was tried on such charge, or that she requested a self-defense instruction at such trial. The "Index to Exhibits" in the transcript of the instant case shows that an "Instruction" was marked as Plaintiff's Exhibit 10. Such exhibit, however, was never offered in evidence, and it was neither included in the record on appeal nor filed separately with us as an exhibit. We thus have no way of knowing what such instruction said.

The only references we find in the transcript to any criminal proceedings are: (a) an answer from Rita revealing that "Mr. Wendt" was her attorney "at the criminal trial," and he had some photographs made of the bruises she sustained when Gene pushed his way into her home the evening before the shooting, (b) one answer by attorney Montgomery disclosing he had read "the murder trial transcript," and (c) a remark by Paulette's attorney in closing argument that Farmers' counsel had said in his opening statement that Rita "was acquitted of all charges." [5]

From this meager record, we have no idea what information Farmers intended to furnish the jury about Rita's murder trial, or what foundation Farmers meant to lay for the admission of the "self-defense jury instruction."

Farmers' theory, as we understand it, is that Rita, in the homicide trial, submitted a self-defense instruction for the trial court to give the jury, and that this constitutes an admission by Rita that she "intended or expected" to cause Gene bodily injury. Farmers cites no authority for the proposition that a jury instruction tendered by a party to a judge in the trial of one case can be utilized in the trial of another case as an admission against such party's interest. The four cases cited by Farmers in support of point II involved the use of *pleadings* —not instructions—as admissions.

Paulette, in her brief, states no reported case has sanctioned the use of a jury instruction from one trial as an admission against interest in another, and we are unaware of any such precedent.

 Additionally, it must be remembered that in the trial of a homicide prosecution, the trial court is *required* to instruct the jury on self-defense when there is evidence raising that issue, MAI–CR 2d, p. XVII, para. 7, 6–1–83; MAI–CR 2d 2.41.-1, Notes on Use 3, 1–1–79, whether or not such instruction is requested by the accused. Consequently, the fact that a self-defense instruction is given in a homicide trial does not establish that it was given at the behest of the accused. We find nothing in the record before us showing that the self-defense instruction at Rita's homicide trial was given at her request. We further point out that the fact that a self-defense instruction is given in a homicide trial does not automatically mean that the accused testified he acted in self-defense. A self-defense instruction is required when evidence supporting it is supplied by the State. *State v. Peal,* 463 S.W.2d 840, 842 (Mo.1971); *State v. Eldridge,* 554 S.W.2d 422, 425[3] (Mo.App.1977).

**5.** The opening statements are omitted from the transcript.

■ It is the duty of an appellant to provide an appellate court a record containing everything necessary for the determination of questions presented to it. *Coulter v. Michelin Tire Corp.*, 622 S.W.2d 421, 437[34] (Mo.App.1981), *cert. denied*, 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 162 (1982); *Ingram v. Civil Service Commission*, 584 S.W.2d 633, 635[4] (Mo.App.1979). On the record here, we hold that Farmers has not demonstrated error in the trial court's refusal to permit Farmers to show that a self-defense instruction was given in Rita's homicide trial, particularly inasmuch as we are aware of no authority holding such evidence admissible. Point II is denied.

■ The remaining assignment of error is point I, wherein Farmers avers that the trial court wrongly denied Farmers' motion for summary judgment, in that "the pleadings and admissions on file" at the time the ruling was made (June 12, 1986), showed conclusively that there existed no material question of fact and that Farmers was entitled to judgment as a matter of law on the issue that Rita intended to cause Gene bodily injury.

Paulette responds that Farmers has failed to preserve that issue for review, in that the verdict-directing instruction given by the trial court at Farmers' request did not submit that Rita intended to cause Gene bodily injury.

The abandonment issue has been discussed *supra* in our consideration of point IV, and we need say nothing further. For the reasons set forth in our treatment of point IV, we hold that Farmers has abandoned the issue it seeks to raise in point I.

Additionally, Missouri appellate courts have traditionally held that a trial court's denial of a motion for summary judgment is not subject to appellate review. That holding has been made when a party has attempted to appeal from the order denying his motion for summary judgment, the rationale being that such an order does not constitute a final judgment for purpose of appeal. *Wilson v. Hungate*, 434 S.W.2d 580, 583[5] (Mo.1968); *Hoevelman v. Reorganized School District R2 of Crawford County*, 430 S.W.2d 753, 754–55[3] (Mo. App.1968).

Here, however, Farmers' appeal is not from the order denying its motion for summary judgment, but instead is from the final judgment itself. Farmers asserts that when an appeal is taken from an appealable judgment, there is no justification for an appellate court to eschew review of a contention by the appellant that the trial court, prior to trial, wrongly denied the appellant's motion for summary judgment.

That, however, is just what occurred in *Parker v. Wallace*, 431 S.W.2d 136 (Mo. 1968). There, the plaintiff sued two defendants. The trial court directed a verdict for one defendant at the close of the plaintiff's evidence, and the jury returned a verdict in favor of the other defendant. The plaintiff appealed; one of his assignments of error complained that the trial court wrongly denied his motion for summary judgment. The opinion stated:

"The matter of the propriety of the court's action in overruling a motion for summary judgment is not an appealable order. [Citation omitted.] Upon that ruling, the issues raised by the pleadings are still in the case, and it is upon those issues, when decided and if timely and properly presented, that an appeal lies." *Id.* at 137–38[2].

An appellant met the same fate in *Hamiltonian Federal Savings & Loan Association v. Reliance Insurance Co.*, 527 S.W.2d 440 (Mo.App.1975). Appealing from an adverse judgment, the appellant argued, among other things, that the trial court erred in denying the appellant's motion for summary judgment. The appellate court held the contention was not properly before it, as the matter of the propriety of a trial court's action in denying a motion for summary judgment is not an appealable order. *Id.* at 444[9]. As authority for its holding, the court cited *Wilson, Parker* and *Hoevelman*. As we have seen, however, in only one of those cases, *Parker*, was the appeal from a final judgment. In the other two, the appeal was from the order denying the motion for summary judgment.

While the rationale of *Parker* and *Hamiltonian Federal* may be suspect, we are constitutionally bound to follow the last controlling decision of the Supreme Court of Missouri. Mo. Const. art. V, § 2 (1945); *Estate of Seabaugh*, 654 S.W.2d 948, 957[4] (Mo.App.1983). Accordingly, on the basis of *Parker*, which is procedurally indistinguishable from the instant case, we hold that Farmers' point I is ineligible for appellate review.

■ However, even if the point were cognizable, it would be unavailing.

In support of its motion for summary judgment, Farmers directed the trial court's attention to certain passages from a deposition taken of Rita January 20, 1986. We have examined them, and find that they are, in all essential respects, consistent with Rita's testimony about the shooting, set forth *supra*.

The only other item to which Farmers referred the trial court in support of the motion for summary judgment was paragraph 5 of Farmers' petition, and the answers of Paulette and Rita thereto. Paragraph 5 alleged:

"While said policy ... was in full force and effect, and on or about March 26, 1983, ... Rita ... assaulted and caused the death of [Gene] by discharging a gun, the projectile from which entered the body of [Gene]."

Paulette's answer to paragraph 5 stated, "Defendant denies that Rita ... assaulted [Gene], but admits the remaining allegations contained in paragraph 5." Rita's answer to paragraph 5 stated, "Defendant denies that she assaulted [Gene], but admits the remaining allegations contained in paragraph 5."

Farmers' position, as we comprehend it, is that respondents, by their answers to paragraph 5, admitted that Rita, as a matter of law, intended to cause Gene bodily injury.

We do not see it that way. It must be noted that the answers of both respondents denied that Rita assaulted Gene; at most, they admitted only that Rita caused Gene's death by discharging a gun. While such admission is susceptible to an inference that such act was intentional, we cannot overlook the fact that the trial court, in considering Farmers' motion for summary judgment, had before it not only the excerpts from Rita's deposition supplied by Farmers, but also segments of a deposition taken of Rita December 28, 1984, in Paulette's suit. In that deposition, Rita stated, among other things, that her finger was not on the trigger when she followed Gene to the dining room, that she did not remember putting her finger on the trigger, that she thought she tripped when she backed away as Gene moved toward her, that she did not know how the gun went off, and that she "didn't consciously pull the trigger."

Rule 74.04(h), Missouri Rules of Civil Procedure (17th ed. 1986), provides:

"In no case shall a summary judgment be rendered on issue triable by jury or the court without a jury unless the prevailing party is shown by unassailable proof to be entitled thereto as a matter of law."

■ Summary judgment is a drastic remedy; for a party to be entitled to summary judgment in its favor, it must be shown on the record that there is no genuine issue of fact and the record must be viewed in the light most favorable to the party against whom summary judgment is sought. *Teter v. Morris*, 650 S.W.2d 277, 285[8] (Mo.App.1982). A genuine issue of fact will be found to exist whenever there is the slightest doubt as to the facts, so long as the fact in doubt is a material one which has legal probative force as to a controlling issue. *Crain v. Missouri Pacific Railroad*, 640 S.W.2d 533, 537[4] (Mo.App.1982); *Peer v. MFA Milling Co.*, 578 S.W.2d 291, 292[1] (Mo.App.1979).

On the record before the trial court at the time it denied Farmers' motion for summary judgment, we hold that the trial court could have reasonably found that there was a doubt as to whether Rita, as a matter of law, intended to cause Gene bodily injury. Accordingly, if we were obliged to

rule Farmers' point I on the merits, we would reject it.

Judgment affirmed.

GREENE, P.J., and HOLSTEIN, J., concur.